**Diana L. MITCHELL,
Plaintiff/Appellee,**

v.

**Debra Gloria Banks SMITH, Individually, and as Executrix of the Estate of Willie A. Bush; and Nellie Pearl Banks, Defendants/Appellants.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 16, 1989.

Permission to Appeal Denied by Supreme Court Oct. 30, 1989.

---

J. Stanley Rogers, Rogers & Richardson, Manchester, for defendants/appellants.

Larry G. Trail, Rogers & Trail, Thomas L. Reed, Jr., Reed & Watson, Murfreesboro, for plaintiff/appellee.

## OPINION

KOCH, Judge.

This appeal involves an intra-family dispute over Willie Arasho Bush's estate. Mr. Bush's daughter filed a will contest in the Circuit Court for Cannon County after one of her cousins attempted to probate a will Mr. Bush signed shortly before his death. A jury found that the will should not be probated because the proponents had procured it through undue influence. The proponents have appealed, contending that the evidence did not support the verdict, that the jury instructions were erroneous, and that the costs should have been taxed to the estate. We affirm the jury's verdict and the trial court's decision to tax the costs to the proponents of the will.

### I.

Willie Arasho Bush was a long-time resident of the Pocahontas community in Coffee County. He lived with his mother after his divorce in 1959 and then by himself after he placed his mother in a nursing home in 1976. He was a frugal, independent man who lived a spartan existence and tended to his own business. In his later years, he spent a great deal of time visiting with friends at the Pocahontas senior citizens' center and taking meals with his relatives and neighbors.

Mr. Bush had been healthy all his life. However, in March, 1986, he suffered renal failure and on April 2, 1986, was admitted to the Veterans Administration Hospital in Nashville. Tests revealed inoperable, high grade cancer of the prostate and bladder, and Mr. Bush's physicians told him that they expected him to live for only a short time. Understandably, the news frightened Mr. Bush, and he found it emotionally difficult to deal with the diagnosis.

The hospital staff recommended that Mr. Bush enter a nursing home, but Mr. Bush insisted upon remaining self-sufficient as long as possible. Discussions with his relatives and friends produced only two alternatives to the nursing home. Nellie Pearl and Thurston Banks, his sister and brother-in-law, suggested that he move in with them, even though they were infirm themselves. Diana Mitchell, his daughter with whom he had only occasional contact during the past twenty-five years, offered to care for him in his own home if he would buy her a double-wide house trailer to live in.

Mr. Bush moved in with Thurston and Nellie Pearl Banks when he left the hospital on April 24, 1986. The Banks and their daughter, Debra Gloria Banks Smith, assumed the responsibility of caring for Mr. Bush who by this time was unable to walk without assistance or to take care of most of his personal needs. They prepared his meals; they gave him his medicine; they did his laundry and looked after his personal hygiene; and they drove him to his doctor's appointments.

Mr. Bush began to get his affairs in order after he left the hospital. He gave Debra Smith detailed instructions concerning his funeral and insisted that she make the arrangements for him before he died. He also told Mrs. Smith that he wanted her to act on his behalf should he require further hospitalization and asked her husband, who was a lawyer, to prepare a power of attorney and a will for him. Mr. Smith declined to prepare the instruments but

recommended other lawyers practicing in McMinnville.

On April 29, 1986, Mr. Bush met with a lawyer selected by Mrs. Smith to discuss his will and the power of attorney. He suffered a setback and was readmitted to the hospital on May 4, 1986. When he returned to the Banks' house two days later, his condition required the use of an in-home nursing service. He was growing more frail but continued to be alert and oriented.

Several days after being released from the hospital, Mr. Bush again discussed the terms of his will with the lawyer chosen by Mrs. Smith. The lawyer was also preparing a will for Mr. Banks, and on May 12, 1986, Mrs. Smith drove Mr. Banks and Mr. Bush to the lawyer's office to sign their wills. Mr. Banks executed his will in the lawyer's office, but Mr. Bush signed his will and the power of attorney in Mrs. Smith's van because he was too weak to come into the office.

The power of attorney Mr. Bush signed gave Mrs. Smith the unrestricted right to act on his behalf. His will named Mrs. Smith as executrix and divided Mr. Bush's estate three ways. Diana Mitchell received $10,000; Nellie Pearl Banks received her brother's car; and Nellie Pearl Banks and Debra Smith received the remainder of his estate. At Mr. Bush's request, Mrs. Smith placed his will in her safe-deposit box, and she and Mr. Banks insist that they were unaware of the contents of Mr. Bush's will except for the disposition of the car.

On May 14, 1986, while returning from his doctor's appointment in Nashville, Mr. Bush explained to Mrs. Smith how she should use the power of attorney. Later, they signed new signature cards giving Mrs. Smith access to Mr. Bush's funds, but Mr. Bush kept possession of his bank books. Mrs. Smith did not write checks without first discussing them with Mr. Bush. Prior to her uncle's death, Mrs. Smith used her uncle's funds to pay for his will, his funeral, and groceries.

Mr. Bush's health continued to decline during May. He became weaker as his nausea, incontinence, and pain increased.

His daughter visited him for the last time on May 22, 1986. He became confused and was slow to respond. His doctor noted on May 28, 1986, that he appeared to be very weak and less alert. Mr. Bush died on June 2, 1986, at the age of seventy. At the time of his death, his estate consisted of a car, a farm in Coffee County valued at $40,000, and over $40,000 in various bank accounts.

Debra Smith filed a petition to probate Mr. Bush's May 12, 1986 will on June 3, 1986 and filed an inventory of his estate on June 14, 1986. Diana Mitchell filed a complaint contesting the will on October 28, 1986. The case was removed to the Circuit Court for Cannon County where, after a three-day trial, a jury determined that Mr. Bush's will was invalid because it had been procured through undue influence "by Debra Gloria Banks Smith and/or Nellie Pearl Banks and/or Thurston Banks."

## II.

The proponents of Mr. Bush's will take issue with the trial court's denial of their motion for a directed verdict on the confidential relationship and undue influence issues. They contend that the contestants' proof was inadequate to create a jury question on these issues. We disagree.

## A.

Directed verdicts are available in will contest cases to the same extent that they are available in other civil cases. *Scott v. Atkins*, 44 Tenn.App. 353, 371, 314 S.W.2d 52, 60 (1957). They are appropriate when the evidence supports one conclusion, *Arp v. Wolfe*, 49 Tenn.App. 294, 299, 354 S.W.2d 799, 801–02 (1956), but are inappropriate when the material facts are in dispute or when there is substantial disagreement concerning the conclusions to be drawn from the evidence. *Curry v. Bridges*, 45 Tenn.App. 395, 406, 325 S.W.2d 87, 91 (1959); *Fitch v. American Trust Co.*, 4 Tenn.App. 87, 94 (1926).

When the proponents of a will seek appellate review of a trial court's denial of a directed verdict, we must take the con-

testants' evidence as true, allow all permissible inferences in the contestants' favor, and disregard all countervailing evidence. If, after doing so, there is any reasonable doubt as to the conclusions to be drawn, we should affirm the denial of the directed verdict. *Arp v. Wolfe,* 49 Tenn.App. at 299, 354 S.W.2d at 801; *Melody v. Hamblin,* 21 Tenn.App. 687, 695, 115 S.W.2d 237, 243 (1937).

### B.

Invalidating a will because of undue influence is generally not a simple undertaking. While undue influence can be proved either by direct or by circumstantial evidence, *In re Depriest's Estate,* 733 S.W.2d 74, 78 (Tenn.Ct.App.1986) (direct evidence); *Patton v. Allison,* 26 Tenn. (7 Humph.) 320, 333 (1846) (circumstantial evidence), direct evidence is rarely available. *Hager v. Hager,* 17 Tenn.App. 143, 161, 66 S.W.2d 250, 260 (1933). Thus, in most cases, the contestants establish undue influence by proving the existence of suspicious circumstances warranting the conclusion that the will was not the testator's free and independent act. *Taliaferro v. Green,* 622 S.W.2d 829, 835–36 (Tenn.Ct.App.1981).

The courts have refrained from prescribing the type or number of suspicious circumstances that will warrant invalidating a will on the grounds of undue influence. Instead, they have pointed out that the undue influence issue should "be decided by the application of sound principles and good sense to the facts of each case." *Halle v. Summerfield,* 199 Tenn. 445, 454, 287 S.W.2d 57, 61 (1956).

The scope of the proof regarding undue influence is quite broad. *See* 1 *Pritchard on the Law of Wills and Administration of Estates* § 145 (4th ed. 1983); 25 *Tenn. Jur.* Wills § 24, at 127 (1985). Over sixty years ago, Judge De Witt, writing for this Court, stated:

> It is generally held that upon such issues every fact and circumstance, no matter how little its probative value, which throws light upon these issues, is admissible. The range of inquiry may cover, not only the provisions of the will itself,

and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to influence him unduly, his relations with persons benefited by or excluded from the will, and the acts and declarations of such persons. Although none of these matters standing alone may be sufficient to establish the issues, yet taken together they may have that effect.

*Hager v. Hager,* 17 Tenn.App. at 161, 66 S.W.2d at 260.

■ The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will. *See In re Elam's Estate,* 738 S.W.2d 169, 173 (Tenn.1987); *Kelly v. Allen,* 558 S.W.2d 845, 848 (Tenn.1977); *Taliaferro v. Green,* 622 S.W.2d at 835–36.

Other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. *See Halle v. Summerfield,* 199 Tenn. at 454–57, 287 S.W.2d at 61–62; *American Trust & Banking Co. v. Williams,* 32 Tenn.App. 592, 606–07, 225 S.W.2d 79, 85 (1948); *see also* 1 *Pritchard on the Law of Wills and Administration of Estates* § 145 (4th ed. 1983); 25 *Tenn.Jur.* Wills § 24 (1985); Tennessee Pattern Instructions—Civil § 11.59.

■ Without direct evidence, a contestant must establish the existence of more than one suspicious circumstance in order to take the undue influence issue to the jury. Proof of a confidential relationship alone will not support a finding of undue influence. *Halle v. Summerfield,* 199 Tenn. at 455, 287 S.W.2d at 61; *Vantrease*

*v. Carl,* 56 Tenn.App. 636, 642–43, 410 S.W.2d 629, 632 (1966).[1] Accordingly, this Court had held that:

> Where ... the contestant shows the existence of suspicious circumstances such as a confidential relationship in combination with the beneficiary's involvement in procuring the will, or in combination with impairment of the testator's mental capacity, there arises the presumption of fraud or undue influence which the proponent of the will must overcome by a preponderance of the evidence.

*Taliaferro v. Green,* 622 S.W.2d at 835–36.

### C.

The proponents of Mr. Bush's will contend that the trial court erred by denying their motion for a directed verdict on the confidential relationship issue. While there is no material evidence that a confidential relationship existed between Mr. Bush and Thurston or Nellie Pearl Banks, we have determined that there is sufficient evidence to create a jury question concerning the existence of a confidential relationship between Mr. Bush and Mrs. Smith.

■ Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson,* 517 S.W.2d 202, 206 (Tenn.Ct.App.1974). In general terms, it is any relationship which gives one person dominion and control over another. *Kelly v. Allen,* 558 S.W.2d 845, 848 (Tenn.1977); *Turner v. Leathers,* 191 Tenn. 292, 298, 232 S.W.2d 269, 271 (1950); *Roberts v. Chase,* 25 Tenn.App. 636, 650, 166 S.W.2d 641, 650 (1942). It is not merely a relationship of mutual trust and confidence, but rather it is one

> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.

*Iacometti v. Frasinelli,* 494 S.W.2d 496, 499 (Tenn.Ct.App.1973).

The relations between family members and relatives are not, in and of themselves, confidential relationships. *Halle v. Summerfield,* 199 Tenn. at 456–57, 287 S.W.2d at 62; *Harper v. Watkins,* 670 S.W.2d 611, 628 (Tenn.Ct.App.1983). However, fiduciary relationships such as guardian/ward, attorney/client, and conservator/incompetent are. *Kelly v. Allen,* 558 S.W.2d at 848; *Parham v. Walker,* 568 S.W.2d 622, 625 (Tenn.Ct.App.1978); *Roberts v. Chase,* 25 Tenn.App. 636, 650–51, 166 S.W.2d 641, 650 (1942); *see also* 1 *Pritchard on the Law of Wills and Administration of Estates* §§ 132–137 (4th ed. 1983).

■ All parties agree that two weeks prior to the execution of his will, Mr. Bush asked Mrs. Smith to assist him with his personal business and told her that he desired to execute a power of attorney permitting her to act on his behalf. There is evidence, although disputed, from which the jury could conclude that Mr. Bush executed the power of attorney as early as April 29, 1986. While the attorney who prepared the power of attorney recanted this testimony at the trial, the weight of the evidence and the lawyer's credibility was for the jury to decide.

A person authorized to act on behalf of another by virtue of an unrestricted power of attorney has a confidential relationship with the person who executed the power of attorney. *See In re Elam's Estate,* 738 S.W.2d 169, 173 (Tenn.1987). Accordingly, there was evidence that Mrs. Smith had a confidential relationship with her uncle before he executed his will. With the evidence in this posture, the trial court properly declined to grant a directed verdict on the confidential relationship issue.

### D.

■ The proponents' argument that the trial court should have granted a directed verdict on the undue influence issue is likewise without merit. In addition to the evi-

---

1. The existence of a confidential relationship is not a suspicious circumstance *per se.* The courts are concerned not with the relationship but with the abuse of the relationship. *Robinson v. Robinson,* 517 S.W.2d 202, 206 (Tenn.Ct. App.1974).

dence of the confidential relationship between Mr. Bush and Mrs. Smith, the contestants introduced evidence of enough other suspicious circumstances to create a jury issue.

Among the suspicious circumstances demonstrated by the contestants are: (1) the lawyer chosen by Mrs. Smith to prepare Mr. Bush's will and power of attorney was a personal and professional acquaintance of Mrs. Smith and her husband; (2) Mr. Bush's physical health and mental faculties were deteriorating at the time; (3) the terms of the will conflicted with Mr. Bush's earlier statements concerning the disposition of his estate; (4) Mr. Bush was living with the Banks at the time he prepared the will; (5) the existence and contents of the will were kept secret; (6) Mr. Bush did not keep the will in his possession after he executed it; and (7) the testimony of the persons involved in preparing the will was inconsistent in many material respects.

The proponents introduced proof to the contrary to support the will. They attempted to portray Mr. Bush as a man in full possession of his faculties, and they undertook to justify his will on the grounds that he prepared it out of gratitude for their care during the last months of his life. It is not the courts' role to weigh the evidence when a motion for directed verdict is filed. If there is conflicting evidence or if there is reasonable disagreement concerning the inferences to be drawn from the evidence, the case should go to the jury. In our view, the trial court was fully justified in denying the proponents' motion for directed verdict.

### III.

The contestants also take issue with the jury instructions. They contend that the trial court erred by refusing to give two of their requested instructions and by charging the jury concerning three issues not supported by the proof. While the charge could have been more closely tailored to the proof, we find that, as a whole, it correctly informed the jury concerning the issues they were called upon to decide.

■ Appellate courts give trial courts leeway with regard to the substance of their jury instructions in will contest cases. *Thomas v. Hamlin*, 56 Tenn.App. 13, 37, 404 S.W.2d 569, 579–80 (1964). However, they should prepare their instructions with care because "will contests are always surrounded with confusion and uncertainty and fraught with great possibilities of the miscarriage of justice" and because jurors have a natural tendency to superimpose their judgment on the testator's. *Hager v. Hager*, 13 Tenn.App. 23, 27 (1930).

■ The trial court's instructions are the jury's only proper source of the legal principles to guide its deliberations. *State ex rel. Myers v. Brown*, 209 Tenn. 141, 148–49, 351 S.W.2d 385, 388 (1961). Accordingly, trial courts should give substantially accurate instructions concerning the law applicable to the matters at issue. *Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn. 1976). The instructions need not be perfect in every detail, *Davis v. Wilson*, 522 S.W.2d 872, 884 (Tenn.Ct.App.1974), as long as they are, as a whole, correct. *In re Elam's Estate*, 738 S.W.2d 169, 176 (Tenn. 1987).

The jury instructions in this case were taken exclusively from the Tennessee Pattern Jury Instructions. The trial court denied all the proponents' requested instructions, and the proponents insist that the denial of two of its requests was reversible error. We disagree.

■ Trial courts should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, and (3) it is a correct statement of the law. *Hayes v. Gill*, 216 Tenn. 39, 42–43, 390 S.W.2d 213, 214 (1965); *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 837 (Tenn.Ct.App.1980); *Tallent v. Fox*, 24 Tenn.App. 96, 114–15, 141 S.W.2d 485, 497 (1940). However, they need not give a special instruction whose substance is already covered in the general charge. *Jack M. Bass & Co. v. Parker*, 208 Tenn. 38, 49, 343 S.W.2d 879, 884 (1961); *Austin v. City*

*of Memphis,* 684 S.W.2d 624, 636 (Tenn.Ct. App.1984).

Borrowing language from *Cude v. Culberson,* 30 Tenn.App. 628, 667, 209 S.W.2d 506, 523 (1947), the contestants requested the trial court to instruct the jury that

> A mentally competent testator need not make an equal distribution of his property and has [the] right to disinherit any one or all of his children, regardless of whether his act is just or unjust in the eyes of others.

While the requested instruction is a correct statement of the law and is applicable to the proof, its substance was already embodied in the trial court's general charge. The trial court, reciting two pattern instructions,[2] stated:

> Every person of sound mind, over the age of 18 years, has the right to make a will directing the disposition of his or her property upon his death in any way he sees fit. He is under no obligation to make such disposition as will meet with the approval of a judge or jury.
>
> The right to dispose of property by will is a fundamental right assumed by law and does not depend upon the right being wisely used.
>
> A will cannot be set aside simply because it may appear to anyone to be unreasonable or unjust.

and

> Neither eccentricities, nor capricious and arbitrary likes and dislikes, nor hatred of relatives, nor old age, nor forgetfulness, nor mental feebleness, nor disease amount to mental incompetency to make a Will, if the decedent nevertheless was of sound mind and disposing memory at the time of the execution of the Will.

The proponents also requested the trial court to instruct the jury that

> It is natural and proper that the testator should bestow the bulk of his property upon those who are around him and who have attended upon and cared for him, to the exclusion of those at a distance, and the fact that he does so furnishes a presumption in favor of a will, rather than against it.

The trial court declined to give the instruction because it was "not supported by any of the case law." Even though the request was taken from an authoritative Tennessee text,[3] we decline to hold the trial court in error for refusing to charge it.

It is not uncommon for older persons to use their power to dispose of their estate as a means to obtain the care and attention they require in their later years. *Van Huss v. Rainbolt,* 42 Tenn. (2 Cold.) 139, 142 (1865). Thus, a testamentary disposition favoring the persons taking care of the testator at the time the will was made is not necessarily a suspicious circumstance warranting the invalidation of a will. By the same token, it is not necessarily a circumstance that should give rise to an inference in favor of a will's validity.

Accordingly, we find that the requested instruction was not accurate. It should not have been couched in terms of a presumption in favor of the will's validity. It would have been more appropriate to instruct the jury that the testator's decision to leave the bulk of his estate to the persons caring for him is not a basis for invalidating the will in the absence of other suspicious circumstances tending to show that the will was not the testator's free and independent decision.

The proponents also contend that the trial court should not have charged the jury concerning confidential relationships,[4] testamentary capacity,[5] and effect of willfully false testimony.[6] We disagree. These charges were supported by the proof. The charge regarding testamentary capacity could have more clearly explained the relationship between testamentary capacity

---

2. *See* TPI—CIVIL §§ 11.51 & 11.55 (2d ed. 1988).

3. *See* 1 *Pritchard on the Law of Wills and the Administration of Estates* § 130, at 182 (4th ed. 1983).

4. TPI—CIVIL § 11.60 (2d ed. 1988).

5. TPI—CIVIL §§ 11.54 & 11.55 (2d ed. 1988).

6. TPI—CIVIL § 2.22 (2d ed. 1988).

and deteriorated mental acuity making a testator more susceptible to undue influence. Nevertheless, it did not mislead the jury when viewed in context of the entire charge.

### IV.

■ The proponents' final argument is that the trial court erred by taxing the costs to them individually rather than to Mr. Bush's estate. Decisions regarding the taxation of costs are within the trial court's discretion, and appellate courts are generally disinclined to interfere with the trial court's decision unless the discretion is abused. *Lewis v. Bowers,* 216 Tenn. 414, 423, 392 S.W.2d 819, 823 (1965); *In re Depriest's Estate,* 733 S.W.2d 74, 79 (Tenn. Ct.App.1986).

■ While proponents who undertake to probate a will in good faith are entitled to have the costs paid from the assets of the estate, it is generally held that the proponents of a will procured through undue influence should be responsible for the costs. *Smith v. Haire,* 133 Tenn. 343, 347, 181 S.W. 161, 162 (1915); *Powell v. Barnard,* 20 Tenn.App. 31, 34, 95 S.W.2d 57, 60 (1936); *Hager v. Hager,* 17 Tenn.App. 143, 161, 66 S.W.2d 250, 260 (1933). In light of the jury's verdict that the proponents obtained Mr. Bush's will through undue influence and after our review of the evidence, we find no basis to conclude that the trial court erred by taxing the costs to the proponents of Mr. Bush's will.

### V.

We affirm the jury's verdict and the trial court's judgment and tax the costs of this appeal to Debra Gloria Banks Smith and her surety for which execution, if necessary, may issue.

TODD, P.J., and FRANKS, J., concur.